IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TODD MICHAEL KENYON, | : | |
| Plaintiff | : | |
| v. | : | Case No. 3:21-cv-170-KAP |
| CORRECTIONS OFFICER MOFFITT, | : | |
| *et al.*, | : | |
| Defendants | : | |

Memorandum Order

Defendants' motion for summary judgment at ECF no. 60 is granted to defendants Bowden and Zeak and denied as to defendant Moffitt as explained below.

Plaintiff Kenyon has been an inmate in several county prisons (Blair, Bedford, Cambria, Somerset) and Department of Corrections prisons (Camp Hill, Laurel Highlands, Mercer). While serving a sentence imposed in Bedford County, Kenyon filed the original complaint in this matter from the Somerset County Prison in late September 2021, alleging that when he was a pretrial detainee in the Blair County Prison in May 2021, he was taken to a cell in the RHU, and while there subjected to an excessive use of force by corrections officers Moffitt (Kenyon sometimes spells his name as Moffit or Moffet), Zeak (Kenyon sometimes spells his name as Zeek or Zeke), and Bowden. Allegedly, Moffitt choked Kenyon to the point of unconsciousness and then, according to the account that Kenyon alleges that he was given by his cellmate, Michael Liebal (Kenyon and defendants sometimes spell his name as Liebold or Liehold), Moffitt allegedly "slammed" Kenyon into a wall and onto a coat hook and then knocked or pulled Kenyon to the ground. This allegedly caused Kenyon a black eye and the loss of two teeth. The motive for the assault was allegedly retaliation for a complaint by Kenyon about conditions at the Somerset County Prison, where Kenyon also alleged he was assaulted by corrections personnel and had had three teeth knocked out. Complaint, ECF no. 6.

After some delay in getting service paperwork the complaint was served on the three corrections officers, who filed a motion to dismiss in June 2022. In response Kenyon filed two proposed amendments of his complaint in quick succession from the Cambria County Prison, the first adding a claim against a fourth corrections officer named Murray, and the second seeking to expand the complaint to allege inadequacies in his health care against several new defendants. The operative Second Amended Complaint is at ECF no. 30. In the original complaint Kenyon alleged "I am unsure how I got so busted up considering I was knocked unconscious...," and did not allege on what date in May 2021 the events happened. By the second amended complaint Kenyon alleged a step-by-step sequence of events on what he admits now is the wrong date of May 29, 2021. Kenyon

alleges that when Kenyon was objecting to being strip searched before being left in the RHU, Moffitt noticed that Kenyon had something in his mouth, and Moffitt placed his hands on Kenyon's neck when Kenyon did not respond to Moffitt's inquiries. Moffitt then "changed his choke hold to a Rear Naked Choke Hold" and Kenyon tapped on Moffitt's arm to inform him in three separate attempts "I [cannot] breathe," "I [cannot] breathe," and "I'm going under." When Kenyon regained consciousness, he alleges Zeak was kneeling on his neck and, after threatening Kenyon not to bite him, stuck a hand in Kenyon's mouth in an unsuccessful attempt to find the piece of paper that Kenyon alleges he had already spat out. Kenyon alleges that he and Liebal were then threatened to keep their mouths shut and Kenyon allegedly was told he would be denied medical care. After the officers left, Liebal allegedly explained to Kenyon what happened while Kenyon was unconscious, which allegedly was Moffitt "slamming" Kenyon off a wall and the floor. The liability of defendants Zeak and Bowden is based on their alleged failure to stop Moffitt from slamming Kenyon around.

Kenyon was seen by a nurse that day, and Kenyon alleges he showed her his "broken teeth" and other injuries resulting from being "slammed." Kenyon alleges that when he was released from the RHU on June 2, 2021, someone in the medical department took an x-ray of Kenyon's eye. Kenyon also spoke by phone with his wife about the events, she called the Hollidaysburg Police Department, and police officers came to investigate Kenyon's complaints that day. I note that the exhibits, including the video footage of the incident that describe the events Kenyon claims took place on May 29, 2021, as happening on May 31, 2021, refer to Kenyon's release from the RHU as being on June 3, 2021. The video footage has a file-created date of June 3, 2021, consistent with the prison's records and the police officers' reports and with Kenyon's other accounts.

The original parties and Murray all consented to my jurisdiction, and I dismissed the complaint against Murray that was proposed to be added in one edition of the amended complaint because Kenyon's allegations were insufficient to state a claim. For reasons previously explained I did not allow Kenyon to add the proposed unrelated medical care claims to this litigation, and told Kenyon he needed to file a separate action raising them. Discovery on the excessive use of force claim proceeded and defendants filed a motion for summary judgment at ECF no. 60, with supporting documents and a flash drive containing fixed-point video camera recording of the incident described in the complaint, at ECF no. 61 through 63. Plaintiff replied at ECF no. 67, with his account of events and declarations by two inmates who allegedly witnessed aspects of the events described by Kenyon. Defendants filed a surreply at ECF no. 68.

A party moving for summary judgment bears the initial burden of pointing the district court to the basis in the record for its argument that there is no genuine issue of material fact. Celotex Corporation v. Catrett, 477 U.S. 317, 323 (1986). If the moving party does so, Fed.R.Civ.P. 56 then obliges the party opposing summary judgment to show by

competent evidence that there is a genuine factual dispute, that is, that sufficient evidence exists so that a reasonable jury applying the relevant law could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986). Where there is a factual dispute, all reasonable inferences must be drawn in favor of the nonmoving party, in this case the plaintiff.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Consistent with his Second Amended Complaint, Kenyon's version of events in opposition to summary judgment, which at points is entirely based on the events as Kenyon claim they were explained to Kenyon by Liebal, is that it was Moffitt who put him in a chokehold. The liability of Zeke and Bowden is based on the theory that they should have intervened to stop Moffit but were deliberately indifferent to Moffitt's use of excessive force. For his part, Moffitt asserts that there was no excessive use of force, and if it is a close call qualified immunity prevents an action for damages against him. Kenyon entirely abandons any attempt to suggest the corrections officers were retaliating for any complaints about other officers at another prison, and instead argues a pure excessive use of force in reaction to what corrections officers may have thought was contraband but was merely a note in support of one of his complaints.

Kenyon's only claim is under Kingsley v. Hendrickson, 576 U.S. 389, 402 (2015), holding that the Fourteenth Amendment prohibits the use of unreasonable force against pretrial detainees. Kingsley v. Hendrickson explains the factors that bear on the reasonableness or unreasonableness of force used by corrections personnel against a pretrial detainee: the relationship between the need for the use of force and the amount of force used, the extent of the plaintiff's injury, any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. Kingsley v. Hendrickson, supra, 576 U.S. at 397. These were well-known factors long before Kingsley. See Smith v. Mensinger, 293 F.3d 641, 648-49 (3d Cir.2002), quoting Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir.2000)(balancing the need for use of force, the relationship between the need and the amount of force used, the extent of injury inflicted, the threat to staff and other inmates perceived by the corrections officers, and any efforts made to temper the severity of the force used.)

Kenyon accepts defendants' correction of the date of events. According to Kenyon's version of event that relies on his Second Amended Complaint as an affidavit, together with various grievances and police reports, the prelude to Kenyon being sent to the RHU was Kenyon calling a corrections officer named Port a "fucking weirdo" and telling Port to get out of his cell. On arrival at cell 10, already occupied by inmate Liebal, Kenyon says he was ordered to strip for a search. Kenyon says he protested about undressing with an onlooker or onlookers so someone told Liebal to face the wall. Kenyon admits that he had

3

a small piece of paper with a note written on it in his mouth and that Moffit asked Kenyon what was in his mouth. Kenyon says that he did not reply.

Kenyon alleges that at this point Moffit changed his hold to a "rear naked choke hold" and over Kenyon's protests choked Kenyon into unconsciousness. According to Kenyon, his source of information, Liebal, told him Moffit then "slammed" Kenyon off the walls "two or three times" and then "slammed [him] into the floor," and the three officers handcuffed Kenyon. Kenyon states that he awoke to Zeak attempting to search Kenyon's mouth for the piece of paper Kenyon had already spit out. Kenyon was uncuffed and given his clothes back.

In the police report of the investigation, Liebal is recorded as telling Officer Fochler on June 3, 2021, that Zeak probed Kenyon's mouth while Kenyon was upright and that what Fochler recorded as a "struggle" ensued, during which (according to Fochler's memorialization of Liebal's recollection) Moffit, Zeak, and Kenyon "rolled into the wall" and Kenyon hit a coathook, resulting in the black eye. After this, Moffitt put Kenyon in a chokehold and all three "went to the ground." According to Liebal, Bowden then removed Liebal from the cell. (I note that the police report and video footage indicate this was done by a fourth officer named Foster, who gives a different sequence of events.) Liebal reported nothing about Kenyon being handcuffed. Upon his return a few minutes later, Liebal observed Kenyon was "alert and responsive" and Liebal explained to Kenyon what he had seen. To Fochler, Liebal described seeing Kenyon with a "black and blue left eye, a cut on his nose, and a loose tooth." Further explanation as to the cause of this "loose tooth" (singular) is not given by Liebal, which is understandable because he did not claim to witness anything other than the coathook/black eye events.

The photographs in the record and medical records show Kenyon with a black eye. The records (including an x-ray) do not show any other injury, so if there was a cut on Kenyon's nose it was so superficial that it had healed without a trace in four days. Although in one picture Kenyon points to where he presumably lost the two teeth he claims were due to Moffitt's "abuse," Kenyon had already alleged that three of his teeth had been knocked out in the Somerset County Prison, and there are no two-teeth gaps, much less gaps from five lost teeth in the photo. Nor is there any bruising or swelling of the cheek or lips that would be expected from Kenyon being "slammed" multiple times into a wall and floor. The application of any other external force to a person's cheek that would be sufficient to break two teeth in a person's mouth but leave no mark is not claimed by Kenyon, and what he does claim is incredible. In answers to interrogatories Kenyon admits, *inter alia*, being seen by medical staff every day between May 31, 2021 until June 4, 2021, for dispensing of medication prescribed for Kenyon, and that he saw a nurse on June 4, 2021, specifically to have his black eye examined. There are no facial injury or teeth-related complaints. Kenyon appeared by videoconference to enter a guilty plea in the Cambria County Court of Common Pleas on June 3, 2021. There is no claim

even by Kenyon that he mentioned any facial injury or the underlying slamming to the judge (Judge Bernstein) or Kenyon's attorney (Tim Burns, Esquire). In discovery, Kenyon denied the assertion that he made no complaints other than about his black eye, but he comes forward with no affirmative evidence of any, or why prison records should be reliable otherwise but inaccurate in this respect.

Kenyon claims that a corrections officer told him that he was released from the RHU without charges for his outburst because he had already received a "Blair County Ass Whooping." The officers from the Hollidaysburg Borough Police Department who investigated Kenyon's complaint and took statements from several corrections officers, and from Kenyon and Liebal, recorded the interviews with Kenyon and at least one of the defendant officers on camera. Those videos are not part of the record. What is part of the record is a complaint by Kenyon dated July 14, 2022, once Kenyon was back in the Somerset County Prison, asking for medical attention because one tooth (singular) had come out "as a result of abuse" in the Blair County Prison. That Kenyon would carry around undetected this broken tooth with a metal screw through it from place to place in two prisons between May 31 and July 14 and not mention it or have it noticed by anyone, including two medical departments, is improbable. Fochler's report recorded that when he interviewed Kenyon on June 3, 2021, Kenyon claimed as injuries "a few broken teeth," but Fochler (who took the photographs in the record) himself recorded only observing a contusion to Kenyon's left eye. Kenyon provides no explanation whether July's tooth is included in or is in addition to the one tooth, the two teeth, or the few teeth he has at various times claimed to have lost.

Clear audiovisual records are well-nigh incontrovertible. *See* Scott v. Harris, 550 U.S. 372, 380–81 (2007). Clear is an important adjective. There is a video record from a fixed point across the prison unit from cell 10 throughout the approximately twenty-minute incident. The problem is that the focus is not on cell 10 and the events in question necessarily took place inside cell 10. The interior can be seen only obscurely, and the enhanced still photographs that defendants submit with their motion help, but not enough to interpret events confidently. Kenyon is escorted up the stairs to the top tier of the unit and into the cell. There is a sheet of translucent plastic or similar material on the tier outside the that blurs the view of the interior. Some minutes later a person identified as Liebal is removed from the cell. There is no evidence of any altercation in the cell, but the angle of the external camera is such that there are portions of the cell that cannot be viewed on camera. Liebal told Fochler that he was removed only after Kenyon was on the floor of the cell. That is, Liebal would have had to have been witness to whatever "choking" and the "slamming" of Kenyon took place. Liebal's account to Fochler does not mention any "slamming" that Kenyon claims Liebal told him about, and Liebal's demeanor is not consistent with what I would expect from an inmate who has just witnessed such an extended unprovoked assault on a fellow inmate.

In the end, there is no clear video. There are no affidavits from the corrections officers, and there is no deposition testimony from Liebal. Some of Kenyon's account is simply unbelievable, and other parts of Kenyon's claims are supported only by Kenyon's assertion as to what Liebal told him. Kenyon's hearsay account of Liebal's alleged statements is in significant part inconsistent with Liebal's hearsay account as recorded by Officer Fochler. If Kenyon would argue that Liebal's true account is the one he gave Kenyon, and not the one he gave Fochler, the problem for Kenyon is that both of Liebal's accounts are hearsay not within the excited utterance or present sense impression exceptions. In the end, Kenyon is left with his recollection, and circumstantial and physical evidence that almost entirely discredits his account. A jury could barely find, if it believed Kenyon's account of being choked to unconsciousness by Moffitt despite no resistance on Kenyon's part, that Moffitt's use of force was excessive and the cause of Kenyon's black eye. After that, Kenyon has no admissible evidence. There is no evidence that would allow a jury to find that Moffitt slammed Kenyon around and knocked out one tooth, two teeth, or a few teeth. There is hardly any evidence to suggest the black eye was not an accident.

There is no evidence to support any claim, including a failure to intervene claim, against either of the other officers. Kenyon's own evidence admits that there was something in his mouth. Contraband can present a danger to Kenyon himself as well as to other inmates. Kenyon brushes it off as paper containing an innocent note, but the officers hardly knew that and for all they knew if it was paper it could have been saturated with K2. Kenyon admits that he was not cooperating with orders to spit it out. Whether Zeak attempted to get the paper out of Kenyon's mouth while Kenyon was upright (Liebal's version) or after he was on the ground (Kenyon's version), Zeak's use of force was not improper.

Kenyon's failure to intervene claim requires that Bowden and Zeak had a reasonable opportunity to intervene, which requires awareness by then that there was a situation requiring intervention. Kenyon assumes that Moffitt violated the Eighth Amendment from the moment he touched Kenyon and does not even vaguely analyze when Moffitt's use of force allegedly became excessive. Kenyon's account of Moffitt's use of force that does not depend on Liebal sounds like a description of a professional wrestling exhibition, but even allowing for Kenyon's literary style and disregarding Liebal's contrary timeline that Moffitt applied the chokehold only after the struggle that resulted in Moffitt's black eye, Kenyon fails to present a genuine issue that either Bowden or Zeak could in a few critical seconds tell the difference between a hold that is adequate and one that is excessive. If a jury found that Kenyon did make the claims about his inability to breathe, that is not evidence that Bowden and Zeak believed (or even should have believed) him. Corrections officers are not required to presume inmates are truthful, and the ability of harmless fake chokeholds to look like real and dangerous chokeholds is

part of the draw of professional wrestling.

For Kenyon's claim of Zeak and Bowden's liability to go to a jury would require evidence that they were able at a glance to determine that Moffitt was applying too much pressure and were able to intervene instantaneously, but knowingly stood by while Moffitt – while Moffitt did what? Kenyon's version is that Moffitt choked him to unconsciousness and then slammed him around until he ended on the floor. However, everything after Kenyon was unconscious requires Kenyon's to present the unrecorded inadmissible hearsay account Liebal allegedly gave to Kenyon on May 31, 2021. Liebal gave a statement to Fochler on June 3, 2021, in which Liebal was present up until the time Kenyon was on the ground. That version, which omits any account of "slamming," is also hearsay. A jury will not be allowed to speculate based on either the inculpatory or exculpatory hearsay account from Liebal about what Zeak and Bowden perceived or even might have perceived. Kenyon has no admissible evidence against them.

It appears from the filing of a change of address that Kenyon has been paroled from the sentences that had him in prison in the first place. Because Kenyon is not the most articulate writer, an in-person pretrial conference will be scheduled by my courtroom deputy. Plaintiff and counsel for the remaining defendant should contact my deputy Clerk to provide dates in the near future when they can attend in person. The conference will address the state of the record and the filing of pretrial statements (the parties should start on that now), the dates for the trial, appointment of counsel for trial if plaintiff seeks appointment, and whether there is any interest in discussing settlement on the one remaining claim.

DATE:  February 1, 2024          

_____
Keith A. Pesto,
United States Magistrate Judge

Notice by ECF to counsel and by U.S. Mail to:

      Todd Kenyon
      Hope Center Ministries
      11076 County Line Road
      Greenville, PA 16125